SHELDON COMPANY PROFIT SHAR-
ING PLAN AND TRUST, Sheldon Com-
pany Defined Benefit Plan and Trust
(Terminated); and George Cares, Paul
Cares, and Louis Cares, as individuals
and as Trustees of both Trusts, Plain-
tiffs,

v.

Michael K. SMITH, as an individual and
as a partner or former partner in Dolin-
ka, Smith & Van Noord, a Michigan
partnership; Marvin J. Dolinka, Harold
J. Smith, Kenneth Van Noord, Gerald R.
Vander Lugt, and Bruce Jelsema, the
other partners or former partners in the
partnership; Robert W. Baird & Co. In-
corporated, a Wisconsin corporation;
BMMG Capital Corp., a Michigan corpo-
ration; Gregory E.V. Dodgson, John
Knight, W.E. Stevenson, James Van Til,
Raymond A. Weigell III, D.H. Brush &
Associates, an Illinois corporation,
Ricky and Susan Kraai, Robert E.
Schermer, Sr., Charles Gardiner, Ted
Vogt, Daniel H. Brush, Donald Morsink,
and Paul Kleinheksel, shareholders, di-
rectors, and/or officers of BMMG Capi-
tal Corp., and/or Trustees of the Buys–
MacGregor, MacNaughton–Greenawalt
& Co. Shareholders' Liquidating Trust
under Agreement dated June 30, 1988, as
amended, Timothy Moore as an individ-
ual employed by and registered agent of
Robert W. Baird & Co., Inc., Oppen-
heimer & Co., Inc., a Delaware corpora-
tion, and Sheldon Altman, an individual
employed by and a registered agent of
Oppenheimer & Co., Inc., Defendants.

No. 1:92–CV–189.

United States District Court,
W.D. Michigan, S.D.

July 2, 1993.

Peter W. Steketee, Peter N. Rigas, Grand Rapids, MI, Kent, for plaintiffs.

Grant J. Gruel, Gruel, Mills, Nims & Pylman, Grand Rapids, MI, Kent, for Dolinka, Smith & Van Noord, Marvin J. Dolinka, Harold J. Smith, Kenneth Van Noord, Gerald R. Vander Lugt, Bruce A. Jelsema.

William C. Reens, Borre, Peterson, Fowler & Reens, PC, Grand Rapids, MI, Kent, Gary M. Saretsky, Hertz, Schram & Saretsky, PC, Bloomfield Hills, MI, Oakland, for Harold J. Smith.

Boyd A. Henderson, Gordon J. Quist, James R. Peterson, Miller, Johnson, Snell & Cummiskey, Grand Rapids, MI, Kent, for Robert W. Baird & Co., Inc.

D. Scott Stuart, Farr & Oosterhouse, Grand Rapids, MI, Kent, for BMMG Capital Corp., Gregory E.V. Dodgson, John Dodgson, Michael G. Dodgson, Tony K. Knight, W.E. Stevenson, James Van Til, Raymond A. Weigell, III, D.H. Brush & Associates, Ricky Kraai, Susan Kraai, Robert E. Schermer, Sr., Charles Gardiner, Ted Vogt, Daniel H. Brush, Donald Morsink, Paul Kleinheksel.

Thomas M. Weibel, Smith, Haughey, Rice & Roegge, PC, Grand Rapids, MI, Kent, for Timothy Moore.

Bradley J. Schram, Gary M. Saretsky, Dana Donohue, Hertz, Schram & Saretsky, PC, Bloomfield Hills, MI, Oakland, for Oppenheimer & Co., Inc., Sheldon Altman.

HILLMAN, Senior District Judge.

This is an amended opinion. On June 4, 1993, this court issued an opinion on all pending motions. Thereafter, plaintiffs filed a motion for clarification and reconsideration of the opinion as it relates to plaintiffs' churning claim. The court withdraws the opinion of June 4, 1993. Following is an amended opinion in which section B–2, The Churning Claim, has been rewritten.

Plaintiffs Sheldon Company Profit Sharing Plan and Trust, Sheldon Company Defined Benefit Plan and Trust, and three people as individuals and as trustees of the two trusts filed a 30–count complaint on March 11, 1992, against 12 named defendants and three "Doe" defendants. Defendants include Buys, MacGregor, MacNaughton, Greenawalt & Co. ("BMMG"), a Michigan corporation and a registered securities broker/dealer; Timothy Moore, BMMG's registered agent; Robert W. Baird & Co. Inc. ("Baird"), a securities broker/dealer incorporated in Wisconsin; Dolinka, Smith & VanNoord ("DSV"), a Michigan accounting firm partnership; Oppenheimer & Co., Inc. ("Oppenheimer"), a securities broker/dealer incorporated in Delaware; and Sheldon Altman, Oppenheimer's registered agent.

On November 24, 1992, plaintiffs filed an amended complaint, adding 16 individuals and one Illinois corporation as shareholders, directors, and/or officers of BMMG. Plaintiffs seek to recover approximately $185,000 embezzled by defendant Michael K. Smith from two separate trusts established by the Sheldon Company for the benefit of its employees, and punitive damages where appropriate.

Before the court are the following motions:

1. Defendant Oppenheimer & Co., Inc.'s, and defendant Altman's Motion for Summary Judgment pursuant to Fed. R.Civ.P. 56.

2. Defendant Baird's Motion to Dismiss for Failure to State a Claim under Fed. R.Civ.P. 12(b)(6) and 9(b). The motion was joined by defendants BMMG and Timothy Moore, BMMG's registered agent.

3. Plaintiffs' Motion for Partial Summary Judgment against Dolinka, Smith & VanNoord pursuant to Fed.R.Civ.P. 56.

## BACKGROUND

Plaintiff Sheldon Company is a Michigan corporation engaged in a retail dry-cleaning business. The company is owned and operated by George Cares, Paul Cares and Louis Cares (collectively "the Careses"). The company established two respective plans for its employees—the Sheldon Company Profit Sharing Plan and Trust and the Sheldon Company Defined Benefit Plan and Trust (collectively, "the Plans").[1] Funds contribut-

---

1. The Defined Benefit Trust was terminated effective October 31, 1989. Its assets were rolled over into the Profit Sharing Plan.

ed to the two Plans were to be held for the exclusive benefit of the participants and their beneficiaries.

Pursuant to section 7.1(a) of the Profit Sharing Plan, the trustees have the responsibility, "consistent with the 'funding policy and method' determined by [Sheldon Company], to invest, manage, and control the Plan assets subject, however, to the direction of an investment manager if the Trustee[s] should appoint such manager as to all or a portion of the assets of the Plan." The Plans permit Sheldon Company, its directors, and/or trustees to designate an investment manager. On July 15, 1985, the two Plans entered into an Investment Management Agreement (the "Agreement") with DSV, a Michigan accounting firm partnership.

Defendant DSV is a four-partner CPA firm doing business in and around Grand Rapids, Michigan. The firm began with the partnership of Harold Smith and Ken VanNoord in 1975. In about 1982, Marvin Dolinka joined the firm which then took its present name.

Michael Smith, the son of Harold Smith, joined the firm as an associate in 1984. Since Michael Smith was a registered investment adviser by designation of the United States Securities and Exchange Commission ("SEC"), upon Smith's employment by DSV in 1984, DSV also was designated by the SEC as a successor investment adviser.[2] Harold Smith retired in January 1987, and his partnership interest in the firm was purchased by Michael Smith.

In the summer of 1985, Smith/DSV opened two brokerage accounts for the Sheldon Plans. One of these was with Oppenheimer & Co. in Chicago, the other with BMMG in Grand Rapids. The agent who handled the account at BMMG was defendant Timothy Moore. Defendant Moore dealt exclusively with DSV regarding the management of the Plans' assets. Allegedly, Moore was provided with a copy of the Investment Management Agreement by DSV.

In 1988, BMMG's business was purchased by defendant Baird, and BMMG was later dissolved. Despite the name change, continuity continued in the local management, personnel, physical location, assets, and general business operations. Defendant Moore, who handled the account at BMMG, stayed on to handle the account at Baird.[3]

In 1986, Smith established a relationship with a closely held Michigan corporation called Call Free, Inc., a company that operated a telephonic referral service. According to Smith, he invested approximately $1,000,000 of DSV's investment advisory clients' funds in Call Free in 1986 and 1987.

It was Smith's practice to order checks from BMMG/Baird to pay himself or to pay one or more entities, real or fictitious, controlled by Smith by which means Smith unlawfully diverted the Plans' funds to his own use. For example, Smith wrote Moore, a registered agent at BMMG, on July 17, 1986, directing BMMG to "issue a check for $25,000 to Call Free, Inc., 6140 28th Street, S.E., Grand Rapids, Michigan 49506 in purchase of 1,000 Shares Common Stock from the account of Sheldon Company Retirement Plan A/C No. 12777[0]17." In August 1987, Smith wrote to the firm ordering a check for $10,000 payable to Executive Capital Co. for a "2% Oil Well Interest." Allegedly, Smith embezzled most of the money from his clients' accounts at BMMG in this manner.

Plaintiffs alleged that starting in about 1985 and continuing possibly until 1991, Smith embezzled at least $185,000 and applied these funds for his own personal bene-

---

**2.** The Feb. 3, 1984, letter from the SEC to DSV reads in part:

> Your registration with this Commission as successor to the business of Michael Kent Smith 4/1/84 is effective as of the date of succession.
>
> IT IS UNLAWFUL FOR ANY PERSON REGISTERED UNDER THIS ACT TO REPRESENT OR IMPLY IN ANY MANNER WHATSOEVER THAT SUCH PERSON HAS BEEN SPONSORED, RECOMMENDED OR APPROVED BY THE COMMISSION OR THAT HIS ABILITIES OR QUALIFICATIONS TO ACT AS AN INVESTMENT ADVISER HAVE IN ANY RESPECT BEEN PASSED UPON BY THE COMMISSION.

**3.** The court will hereinafter use "Baird" and "BMMG" interchangeably for purposes of convenience, depending on which entity or entities committed the act in question.

fit. Between 1986 and 1989 Smith directed BMMG/Baird to issue a number of checks written on the Sheldon Plans' account and signed in each case by two BMMG/Baird employees. Smith ordered the following withdrawals from the Plans' account at BMMG:

| Date | Description of Payee or Other Transaction | Amount | Source |
|------|-------------------------------------------|--------|--------|
| 7/18/86 | Call Free, Inc. | $ 25,000.00 | BMMG |
| 9/26/86 | Call Free, Inc. | $ 10,000.00 | BMMG |
| 10/20/86 | Call Free, Inc. | $ 10,000.00 | BMMG |
| 6/04/87 | The New Call Free, Inc. | $ 50,000.00 | BMMG |
| 6/17/87 | The New Call Free, Inc. | $ 30,000.00 | BMMG |
| 8/26/87 | Executive Capital Co. | $ 10,000.00 | BMMG |
| 4/28/87 | Wire transfer* | $ 6,276.13 | BMMG |
| 6/13/89 | Executive Capital Co. | $50,000.00 | Baird |
| * Total (excluding 4/28/88 disbursement) | | $185,000.00 | |

Smith hid the Call Free investment from the trustees after he took the money by mailing to them quarterly reports that falsely overstated and misrepresented the value of their account. DSV billed the Plans for investment advisory services based on these falsely inflated reports.

Call Free went bankrupt in the summer of 1987. Smith's embezzlement was discovered by the trustees in late May 1991 through Smith's involvement in the Model Pattern Company's Model Pattern Retirement Plans ("Model Pattern Plan"). In April 1991, the Model Pattern Company was making a claim against DSV for losses incurred in the Model Pattern Plan. The Model Pattern Plan claimed that its losses were caused by bad investment advice given by Smith. At a partnership meeting in April 1991, Smith told his partners that similar claims might be arising out of "investment advice" he had given to other clients as well. The firm then instituted an internal audit to determine the extent to which loss of investment dollars might be claimed by other investment clients.

The other account opened by Smith was with Oppenheimer & Co., Inc., in Chicago in the summer of 1985. Altman was the Oppenheimer account representative. Although apparently no funds were embezzled from this account by Smith, plaintiffs claim Oppenheimer unlawfully "churned" the account. Smith received confirmation slips for all the trades, as well as monthly statements summarizing the transactions. Smith updated his own inventory daily with the confirmations. (Smith Dep. at 205). According to plaintiffs, Smith, although their investment adviser, did not provide copies of the account statements, confirmation slips, or other related documents to plaintiffs.

Oppenheimer and Altman ultimately learned that Smith had embezzled from a number of his clients, including the Sheldon Plans, although not from the Plans' Oppenheimer account.

Smith was charged with a number of crimes arising out of these transactions in a Michigan court. He entered a guilty plea to at least one count, and was sentenced to a substantial jail term.

In March 1992, plaintiffs instituted this action against Baird, Moore, Oppenheimer, Altman and others to recover compensatory and punitive damages. Plaintiffs alleged that both defendants Baird and Oppenheimer received a copy of the Sheldon Investment Management Agreement and that they failed to inform plaintiffs of Smith's wrongdoing. Plaintiffs charged that defendants committed acts of negligence, gross negligence, recklessness, or intentional wrongdoing. Plaintiffs alleged that defendants violated their fiduciary duties owed to the Plans by permitting Smith to order withdrawals from Plans'

accounts without written authority from the trustees, and without defendants' obtaining adequate or accurate information regarding the Plans' investment objectives.

No dispute exists that the Investment Management Agreement was executed by George Cares, trustee of the Plans, and Smith/DSV. Neither Oppenheimer nor Altman were parties to the agreement. It is disputed, however, whether Oppenheimer received a copy of the Investment Management Agreement. Plaintiffs claim that even if Altman failed to receive a copy of the Agreement, Altman had a duty to discover the extent of Smith's authority pursuant to Rule 405, the "know your customer rule" of the New York Stock Exchange. Rule 405 provides in pertinent part:

> Every member organization is required ... to
>
> (1) Use due diligence to learn the essential facts relative to every customer ... and every person holding power of attorney over any account accepted or carried by such organization.

Plaintiffs alleged that Altman or Smith, or both, not only churned the account but also traded on margin in it, in violation of the stated investment objectives in the Investment Management Agreement.

## DISCUSSION

### I.

### DEFENDANTS OPPENHEIMER AND ALTMAN'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs' claims against defendants Oppenheimer and Altman include churning, improper margin and option trading, excessive commissions, failure of defendants Oppenheimer and Altman to know their customers, and failure to abide by the known terms and limitations of the Investment Management Agreement.

Before this court is a Motion for Summary Judgment filed on May 5, 1993, pursuant to Fed.R.Civ.P. 56, by defendants Oppenheimer and Altman, predicated upon the following grounds:

1. Plaintiffs' claims against defendants Oppenheimer and Altman based on section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, fail to state a claim upon which relief may be granted because plaintiffs have failed to allege the requisite elements of a section 10(b) and Rule 10b-5 claim;

2. Plaintiffs have failed to meet the requirement of the statute of limitations applicable to claims under section 12(2);

3. The complaint fails to allege the requisite elements comprising a claim under section 12(2);

4. Plaintiffs' claim against defendants based on section 17 of the Securities Act of 1933, 15 U.S.C. section 77q, fails to state a claim upon which relief may be granted because there is no private right of action under section 17, and

5. The complaint fails to state a claim for controlling person liability under § 15 of the 1933 Act and § 20(a) of the 1934 Act.

Rule 56 requires the moving party to show that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Therefore, the court must look at the record in this case in the light most favorable to the nonmoving party. The court has carefully considered all the arguments and authorities relied upon by the parties in their briefs. For the reasons that follow, defendants' Motion for Summary Judgment against plaintiffs is GRANTED.

### A. Summary Judgment Standard

■ Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). The crux of summary judgment is determining "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91

L.Ed.2d 202 (1986). In making this determination, the court must examine the record as a whole by reviewing all pleadings, depositions, affidavits and admissions on file, drawing all justifiable inferences in favor of the party opposing the motions. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

■ The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53 (1986); *Kramer v. Bachan Aerospace Corp.*, 912 F.2d 151, 153–54 (6th Cir.1990). If the moving party demonstrates there is an absence of evidence supporting the nonmoving party's case, the party opposing the motion must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356; *Kramer*, 912 F.2d at 153–54. To sustain this burden, the non-moving party cannot rest on the mere allegations of the pleadings. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553; Fed.R.Civ.P. 56(e). Rather, the non-moving party must come forward with specific facts to support its claims and show there is a genuine issue for trial. *Id.*

In recent years, the Supreme Court has encouraged the use of summary judgment where appropriate to ensure just, speedy, and efficient determinations in each case. *Celotex*, 477 U.S. at 327, 106 S.Ct. at 2554–55 (1986); *Daughenbaugh v. Bethlehem Steel Corp.*, 891 F.2d 1199, 1205 (6th Cir.1989). The Sixth Circuit has recognized that the federal courts have entered a "new era" in summary judgment practice. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478–81 (6th Cir.1989). As a result, mere allegations in support of the non-moving party are inadequate because the "mere existence of a scintilla of evidence in support of the positions will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512; *Cloverdale Equip. Co. v. Simon Aerials, Inc.*, 869 F.2d 934, 937 (6th Cir.1989).

**B. Alleged Violation of Section 10(b) and Rule 10b–5**

**1. Plaintiffs have failed to establish the requisite elements to make out a claim under section 10(b) and Rule 10b–5.**

**a. There was no direct purchase or involvement in sale of any security between plaintiffs and defendants Oppenheimer and Altman.**

It is unclear what allegations plaintiffs were making in their section 10(b) and Rule 10b–5 claims against defendants Oppenheimer and Altman. In Plaintiffs' Response to Oppenheimer's and Altman's Motion for Summary Judgment, plaintiffs failed to discuss the elements required to make out their section 10(b) and Rule 10b–5 claims. Plaintiffs alleged in paragraph 89 of their Complaint in a conclusory manner that defendants Oppenheimer and Altman unlawfully engaged in "churning, inappropriate investments, and improper margin and option trading and excessive commissions." Plaintiffs also alleged that defendants Oppenheimer and Altman failed to "know their customers, [and failed] . . . to abide by the known terms and limitations of the investment advisory agreement, [all of which were] accompanied by material misrepresentations of fact or material omissions, constituting violations of section 10(b) and Rule 10b–5."

■ An essential requirement for plaintiffs' section 10(b) and Rule 10b–5 claims[4] is that plaintiffs must establish defendants' misrepresentations or omissions were made in connection with the purchase or sale of any

---

4. Pursuant to section 10(b), 15 U.S.C. § 78j(b), the Securities Exchange Commission promulgated Rule 10b–5, which makes it unlawful:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240. 10b–5 (1992).

security. *See Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 733, 95 S.Ct. 1917, 1924, 44 L.Ed.2d 539 (1975). *See also Michaels Bldg. Co. v. Ameritrust Co., N.A.,* 848 F.2d 674, 679 (6th Cir.1988). In the case presently before this court, there could be no violation of section 10(b) and Rule 10b–5 because defendants were not direct participants in any securities transactions between plaintiffs and defendants. Plaintiffs deliberately transferred to Smith/DSV full authority to make investment decisions concerning the Sheldon Plans. Having done so, I am satisfied plaintiffs have relinquished their implied cause of action against defendants Oppenheimer and Altman under section 10(b) and Rule 10b–5 claims.

In *Congregation of the Passion, Holy Cross Province v. Kidder Peabody & Co.,* 800 F.2d 177, 181 (7th Cir.1986), a religious community established two separate funds and hired an investment adviser to manage these funds. The investment adviser in turn chose numerous brokerage houses through which he executed trades on behalf of the funds. Plaintiff subsequently sued the investment adviser and the broker-dealers for engaging in imprudent trading activities, alleging numerous causes of actions. The issue on appeal by plaintiff was whether defendant Kidder Peabody violated section 10(b) and Rule 10b–5. The Seventh Circuit stated:

> In [*O'Brien v. Continental Illinois National Bank and Trust Company,* 593 F.2d 54 (7th Cir.1979) ], we refused to extend the implied cause of action under Rule 10b–5 to a "claim made by persons who have deliberately chosen to delegate the power to make investment decisions that the recipient of the power has misused it." *Id.* at 61. Similarly, in this case, we cannot imply a violation of section 10(b) and Rule 10b–5 when the plaintiff transferred to Mr. Newell [investment adviser] full authority to make investment decisions. [Plaintiff] made no investment decisions; it hired Mr. Newell for that purpose. Mr. Newell had "full discretion to develop and implement a prudent portfolio strategy." . . . [Plaintiff] was not required to approve each transaction. (citations omitted).

*Id.*

In the instant case, as in the *O'Brien* and *Congregation* cases cited above, plaintiffs transferred to Smith full authority to make investment decisions. The record is clear that the Careses made no investment decisions. Therefore, Careses were not the actual purchasers or sellers of securities. Since I find that no actual purchase or sale of securities occurred between plaintiffs and defendants Oppenheimer and Altman, plaintiffs can make out no claim that misrepresentations or omissions were made in connection with any purchase or sale of securities.

**b. There is no proof of misrepresentations or omissions.**

■ Even if the alleged misrepresentations and nondisclosures occurred "in connection with the purchase or sale of any security," 17 C.F.R. § 240.10b–5, I conclude that defendants are entitled to summary judgment. It was plaintiffs' burden to establish misrepresentations and nondisclosures. This, plaintiffs have not done. Plaintiffs made only conclusory allegations unsupported by specific facts.

Plaintiffs' claims against defendants Oppenheimer and Altman regarding misrepresentations or omissions actually hinge on defendants' alleged failure to know their customers, and to abide by the known terms and limitations of the Investment Management Agreement. In other words, plaintiffs argue that defendants owed them a duty to prevent the wrongdoing of Smith/DSV.

There exists no evidence which leads the court to conclude that defendants Oppenheimer and Altman had or should have had reason to believe that Smith/DSV, whom the Careses had independently and voluntarily entrusted with their accounting and investment advisory/management work, were involved in misdeeds. It is undisputed that Oppenheimer and Altman fulfilled their duty to provide plaintiffs with accurate confirmation slips and monthly statements by sending these documents to Smith. Since defendants were not a party to the Investment Management Agreement and did not have any supervisory authority over Smith or any duty to prevent the wrongdoing of Smith, the Careses' chosen investment adviser, I find that

defendants Oppenheimer and Altman satisfied their legal obligations to the Careses by sending the accurate confirmation slips and monthly statements to Smith. *See Zimmerman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 151 Mich.App. 566, 572–73, 391 N.W.2d 353 (1986), in which the court held that a mother's misplaced reliance on her son to read the documents could not be a means of imposing stricter duty on defendant broker when the broker satisfied his obligation to keep both customers reasonably informed of account activity by mailing confirmation slips and monthly statements to the mother who was co-owner of a joint account with her son. *See also Sherman v. Sokoloff*, 570 F.Supp. 1266 (S.D.N.Y.1983) (futures commission merchant was not liable for any fraud perpetrated by the floor broker, and had no duty to supervise the training activities of the registered floor broker).

■ Furthermore, liability under section 10(b) and Rule 10b–5 for failure to disclose depends upon the existence of a duty to disclose. *Chiarella v. United States*, 445 U.S. 222, 230, 100 S.Ct. 1108, 1115–16, 63 L.Ed.2d 348 (1980). This duty arises only when there exists a relationship of trust and confidence between parties to a transaction. *Id.* The Seventh Circuit in *Congregation* concluded that the relationship between the broker/dealer and the Congregation was not such a relationship that gave rise to any duty:

> [T]he Congregation neither sought nor received advice of any kind from the dealers. Indeed, there were no contacts of any kind between the dealers and the Congregation other than the accurate confirmation slips. The dealers never recommended Mr. Newel [the investment adviser] or reassured the plaintiff about his performance.... In short, the dealers acted merely as the instrument for executing the transactions orchestrated by Mr. Newel. This relationship did not create a duty to disclose, or a duty to make sure that the customer understood the confirmations. (citation omitted).

*Congregation*, 800 F.2d at 183. *See also Rolf v. Blyth, Eastman Dillon & Co.*, 637 F.2d 77, 80, (2d Cir.1980) (On appeal from remand, the Second Circuit specifically disavowed its earlier broad reading of *Rolf*, 570 F.2d 38 (2d Cir.), *cert. denied*, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978), stating that *Rolf* "does not impose liability on a broker-dealer who merely executed orders for 'unsuitable' securities made by an investment adviser vested with sole discretionary authority to control the account.")

No evidence exists in this record that plaintiffs and defendants Oppenheimer and Altman had a special relationship of trust or confidence. Plaintiffs never sought nor received advice of any kind from defendants. Defendants never advised the Careses nor had any contact with them. No claim was made that defendants recommended Smith/DSV be hired as plaintiffs' investment adviser. Defendants acted merely as the instrument for executing the transactions directed by Smith to whom plaintiffs had delegated their decision-making power over their investments.

In sum, I conclude that there was no direct involvement, nor any direct contact between plaintiffs and defendants Oppenheimer and Altman. Likewise, no proof exists of any actionable misrepresentations or omissions. Therefore, I am satisfied that defendants Oppenheimer and Altman did not violate section 10(b) and Rule 10b–5. I therefore grant defendants Oppenheimer and Altman's Motion for Summary Judgment on plaintiffs' section 10(b) and Rule 10b–5 claim.

### 2. The Churning Claim

■ Churning is a "shorthand expression for a type of fraudulent conduct in a broker-customer relationship where the broker 'overtrades' a relying customer's account to generate inflated sales commissions." *Craighead v. E.F. Hutton & Co.*, 899 F.2d 485, 489 (6th Cir.1990) (citation omitted). Part of plaintiffs' Rule 10b–5 claim is, in addition to fraudulent misrepresentation, fraudulent excessive trading or "churning," as reflected in the total commissions charged by defendants Oppenheimer and Altman in the Oppenheimer account. Plaintiff's brokerage records reflect the following activity:

| Year | Commissions | Securities Value at Year End | Percentage |
|------|-------------|------------------------------|------------|
| 1985 | $ 1,397 | $ 69,908 | 2.0% |
| 1986 | 7,156 | 133,695 | 5.4 |
| 1987 | 11,798 | 114,566 | 10.3 |
| 1988 | 17,224 | 198,912 | 8.7 |
| 1989 | 34,242 | 335,276 | 10.2 |
| 1990 | 39,481 | 242,890 | 16.2 |
| 1991 | 11,428* | | |

* All securities were transferred to Baird & Company in September 1991. The account was essentially inactive from shortly after the discovery of Smith's dishonesty in early May 1991.

Plaintiffs argue that brokerage commissions should average about one percent of portfolio value and that commissions above the one percent margin are excessive. This is reflected in the following computations:

| Year | Actual Commissions | Commissions at 1% | Excess |
|------|--------------------|--------------------|--------|
| 1986 | $ 7,156 | $1,337 | $ 5,819 |
| 1987 | 11,798 | 1,146 | 10,652 |
| 1988 | 17,224 | 1,989 | 15,235 |
| 1989 | 34,242 | 3,353 | 30,889 |
| 1990 | 39,481 | 2,429 | 37,052 |
| 1991 | 11,428 | 2,429 | 8,999[5] |
| Total | | | $108,646 |

(Plaintiffs' Complaint at ¶¶ 40, 41).

 In order for plaintiffs to prevail on a claim for churning, plaintiffs must prove each of the following elements: "1) the trading must be excessive in light of the customer's investment objectives; 2) the broker must exercise control over the account; and 3) the broker must act with intent to defraud or with willful and reckless disregard of the customer's interests." *M & B Contracting Corp. v. Dale,* 795 F.2d 531, 533 (6th Cir. 1986). As I am satisfied that plaintiffs cannot establish the second and third elements in their churning claim against defendants Oppenheimer and Altman, I need not inquire at this time into whether trading in the Sheldon account was in fact excessive in light of Sheldon Plans' investment objectives. *See Craighead, supra,* 899 F.2d at 489–91 (setting forth inquiry standards on trading excessiveness and turnover ratio).

**a. Oppenheimer and Altman did not control the account.**

There is no evidence to support a finding that defendants Oppenheimer and Altman at any time controlled plaintiffs' account. The evidence clearly establishes that Smith exercised sole discretion over the account with Oppenheimer and Altman. Seth Anderson, plaintiffs' expert witness, stated that the fact that Smith, a CPA, and DSV, a CPA firm, were registered as an investment adviser, suggested that the account was controlled by Smith/DSV. (Anderson Dep. at 166, Defendants' Ex. 23). *See Gargallo v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 961 F.2d 1577 (6th Cir.1992) (there was no evidence to support a reasonable conclusion that defendant at any time controlled plaintiff's account). Furthermore, Smith also testified as follows:

5. There appears to be an error in plaintiffs' 1991 calculations.

Q: And when—before you made a purchase, I assume you reviewed the research [on the stock]?

A: Sure.

Q: Discussed it with [Altman], and then—

A: Oh, yeah.

Q: —independent of his recommendation you made you own decision?

A: Very definitely. Whether it was Sheldon Altman or whether it was Tim Moore, I would discuss the relative merits of the stock before there was a purchase made. Neither of them had any of type of discretionary authority.

Q: And there weren't any unauthorized trades in the Oppenheimer account at any time; were there?

A: No, neither account.

(Smith Dep. at 204, Defendants' Ex. 26).

Plaintiffs argue that defendants actually controlled the account because Smith testified that, of all the trades in the account, seventy-five percent (75%) were based on Altman's recommendations. However, recommendations do not equal control. As the registered investment adviser, Smith had the authority to agree or disagree with Altman's recommendations. Although Smith received Oppenheimer's research on stocks, it is not disputed that the final decision as to what to do with the research was Smith's. Defendants in fact executed orders for Smith, who had sole authority to manage the Sheldon account. It has long been clear that a broker/dealer usually "cannot be held guilty of overtrading in an account where transactions are initiated by the customer." *See* Louis Loss & Joel Seligman, VIII Securities Regulation 3547, 3879 (3d ed. 1989) (quoting *Thomson & McKinnon*, 35 SEC 451, 454 (1953), following dictum in *E.H. Rollins & Sons, Inc.*, 18 SEC 347, 380 (1945).

Since it is undisputed that defendants acted merely as the instrument for executing the transactions orchestrated by Smith/DSV, and had no supervisory authority over Smith/DSV, I am satisfied that no material fact question exists concerning whether Oppenheimer and Altman controlled the Oppenheimer account. As a matter of law, they did not.

**b. There is no proof of defendants' intent to defraud.**

With respect to the other element of churning, i.e., intent, plaintiffs, when faced with Oppenheimer and Altman's Motion for Summary Judgment, have failed to offer evidence that defendants acted with intent to defraud plaintiffs.

The Second Circuit has held that "[c]hurning, in and of itself, may be a deceptive and manipulative device under section 10(b), the scienter required by 10(b) being implicit in the nature of the conduct." *Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir. 1983). Therefore, the scienter element of churning may be inferred from the amount of commissions charged or from an annual turnover rate in excess of six. *See Craighead, supra. See also Heller v. Rothschild*, 631 F.Supp. 1422, 1424 (S.D.N.Y.1986); *Rush v. Oppenheimer & Co., Inc.*, 592 F.Supp. 1108, 1112 (S.D.N.Y.1984).

In the present case, even though the percentage of commissions in 1989 and 1990 in the Oppenheimer account by itself may suggest an inference of excessiveness when compared with the percentage of commissions in previous years, defendants Oppenheimer and Altman, as stated above, merely executed the buy and sell orders at the direction of Smith/DSV. Plaintiffs have produced no evidence that defendants induced these transactions or acted with fraudulent intent to carry out these transactions in order to create commissions. One full year after this action was filed and immediately prior to the March 15, 1993, close of discovery, Anderson, plaintiffs' expert witness, was not able to testify that defendants conducted these transactions for Smith/DSV in order to generate commissions:

Q: Other than the level of activity in the account, do you have any reason to believe that the recommendations made by Mr. Altman and/or Oppenheimer were intended only to generate commissions?

A: At this point I can't say that, but I have—as I said, I have not gotten into

the account as far as I would need to be able to make a determination of that. (Anderson Dep. at 167, Defendants' Ex. 23).

In sum, I am satisfied that plaintiffs have failed to offer proof that defendants Oppenheimer and Altman controlled the account. Plaintiffs have also failed to establish that defendants Oppenheimer and Altman acted with intent to defraud or with willful and reckless disregard of the customer's interests. I hereby grant defendants' summary judgment motion on plaintiffs' churning claim.

### 3. Statute of Limitations

Defendants Oppenheimer and Altman argue that since the Careses filed their complaint on March 11, 1992, any churning claims arising from transactions made in the Plans' account prior to March 12, 1989, are barred by the three-year statute of limitations set forth in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* —— U.S. ——, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991). Defendants further argue that the "one year from discovery rule" also precludes any recovery sought by the Careses for transactions occurring from March 11, 1989, through March 11, 1991, as the Careses had notice of the alleged wrongdoing at or near the time of its occurrence. Regardless, I am satisfied certain claims subsequent to 1989 have survived. However, since I have dismissed the section 10(b) and Rule 10b–5 claim on the basis of no direct purchase or sale between plaintiffs and defendants Oppenheimer and Altman, and on the basis of plaintiffs' failure to establish the elements for a successful churning claim, the issue concerning the statute of limitations is moot.

### C. Alleged Violation of Section 12(2) of the Securities Act of 1933

#### 1. Statute of Limitations

■ Section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*, imposes liability upon one who misrepresents a material fact or omits to state a material fact "by means of a prospectus or oral communication" in connection with the purchase or sale of securities. However, section 12(2) is governed by the statute of limitations contained in Section 13, 15 U.S.C. § 77m. The section bars actions

> unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence.... In no event shall any such action be brought to enforce a liability created ... under Section [12(2)] ... more than three years after the sale.

Compliance with the statute of limitations section "is an essential substantive ingredient of a private cause of action under section 11 or section 12(2)." *Bresson v. Thomson McKinnon Secur., Inc.,* 641 F.Supp. 338 (S.D.N.Y.1986). *See also Platsis v. E.F. Hutton & Co.,* 642 F.Supp. 1277 (W.D.Mich. 1986), *aff'd,* 829 F.2d 13 (6th Cir.1987), *cert. denied.,* 485 U.S. 962, 108 S.Ct. 1227, 99 L.Ed.2d 427 (1988). Accordingly, the Careses' section 12(2) claim is absolutely barred to the extent it pertains to transactions executed prior to March 11, 1989.

Although I am satisfied the section 12(2) claim is barred to the extent it pertains to transactions executed prior to March 11, 1989, nevertheless, for the reasons set forth below, I am convinced as a matter of law that defendants Oppenheimer and Altman did not commit section 12(2) violations.

#### 2. There Were No Oral or Written Misrepresentations or Omissions Under Section 12(2) of the Act.

■ Section 12(2) subjects a seller to liability only if the sale arises "by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77*l*. "A fact is 'material' if it is substantially likely that a reasonable investor would consider the matter important in making an investment decision." *SEC v. Washington County Utility District,* 676 F.2d 218 (6th Cir.1982). *See also TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).

Pursuant to my earlier analysis of section 10(b) and Rule 10b–5, I have concluded that there was no direct purchase or sale of any security between plaintiffs and defendants. Therefore, plaintiffs' section 12(2) claim is moot. Furthermore, misrepresentations or omissions to state a material fact must be coupled with a written representation in a prospectus or an oral communication for a claim of section 12(2) violation. In the case at bar, defendants Oppenheimer and Altman never offered investment advice directly to the Careses. According to Smith's testimony, there was no wrongdoing by Oppenheimer and Altman, and all trades were conducted according to Smith's directions and wishes. (Smith Dep. at 217, Defendant's Ex. 25). Since there was no communication between the Careses and defendants, there could be no misrepresentations or omissions. Therefore, I find as a matter of law that no violation of section 12(2) occurred. I hereby grant defendants' motion for summary judgment on the section 12(2) claim.

## D. Private Cause of Action under Section 17.

 Plaintiffs charge defendants Oppenheimer and Altman with offering or selling securities to the Sheldon Plans by the use of one or more means or instruments of transportation or communication in interstate commerce. Defendants argue that the claim under section 17(a) of the 1933 Act, 15 U.S.C. § 77q(a), must be dismissed because there is no implied right of action under this section.

15 U.S.C. § 77q states in pertinent part:
(a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

. . . .

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

There is a split among the circuits as to whether a civil cause of action is implied under section 17(a). *See* Louis Loss, *The Assault on Securities Act Section 12(2)*, 105 Harv.L.Rev. 908 (Feb.1992) (commentary). The Sixth Circuit has in the past implied the existence of a section 17(a) private cause of action. *Nichols v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 706 F.Supp. 1309, 1315 (M.D.Tenn.1989) (quoting *E.g., Gutter v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 644 F.2d 1194, 1196 (6th Cir.1981), [*cert. denied*, 455 U.S. 909, 102 S.Ct. 1256, 71 L.Ed.2d 447 (1982)]; *Nickels v. Koehler Mgmt. Corp.*, 541 F.2d 611, 614 (6th Cir.1976) [*cert. denied*, 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977)]). Defendants' reliance on *Leoni v. Rogers*, 719 F.Supp. 555 (E.D.Mich.1989), is misplaced[6] because the Sixth Circuit confirmed a private cause of action in *Craighead, supra*, 899 F.2d at 492, stating:

Whether section 17(a) provides for a private cause of action has been the subject of debate between the circuits and the Supreme Court for decades. To date, the Supreme Court has expressly reserved the question in five cases. Five circuits, the Fourth, Fifth, Eighth, Ninth, and Eleventh, have held that section 17(a) does not imply a private cause of action. The Second and Seventh Circuits have left the question "open."

This court has held that section 17(a) implies a private cause of action only for "purchasers." *Gaff v. FDIC*, 814 F.2d 311, 319 (6th Cir.), *vacated in part on other grounds*, 828 F.2d 1145 (1987); *Gutter v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 644 F.2d 1194, 1196–97 (6th Cir.1981), *cert denied*, 455 U.S. 909 [102 S.Ct. 1256, 71 L.Ed.2d 447] (1982); *Simmons v. Wolf-*

---

6. Defendants quoted the following from *Leoni*:
 As is inescapable from its review of current law, this Court concludes that [finding a private right of action under § 17(a)] has all but reached the end of its life in the federal courts. After evaluating the decision in *In re WPPPS*

[823 F.2d 1349] this Court now declines to place itself in the dwindling minority of federal courts [finding such a right of action].
*Leoni*, 719 F.Supp. at 561–62 (quoting *Gilbert Family Partnership v. Nido Corp.*, 679 F.Supp. 679 (E.D.Mich.1988)).

*son,* 428 F.2d 455, 456 (6th Cir.1970) (per curiam), *cert. denied,* 400 U.S. 999 [91 S.Ct. 459, 27 L.Ed.2d 450] (1971).

Although I am satisfied that, in this Circuit at the present time at least, a private cause of action for "purchasers" exists under section 17(a), since I have concluded that there was no purchase or sale of any security between plaintiffs and defendants, I shall grant defendants' motion for summary judgment on the section 17(a) claim.

### E. Secondary Liability under 15 U.S.C. § 77o and § 78t

Plaintiffs claim that defendants Oppenheimer and Altman are secondarily liable under § 15 of the 1933 Act, 15 U.S.C. § 77o, and § 20(a) of the 1934 Act, 15 U.S.C. § 78t(a). Sections 15 and 20(a) permit liability to be derivatively imposed on those who directly or indirectly control primary violators of the securities laws.

Controlling person claims require the existence of a principal violation of the Securities Act. "As with the aiding and abetting doctrine, plaintiffs must plead a primary violation of the securities laws and knowledge of the wrong." *Bernstein v. Crazy Eddie, Inc.,* 702 F.Supp. 962, 979 (E.D.N.Y.1988). *See also SEC v. Coffey,* 493 F.2d 1304, 1316 (6th Cir.1974), *cert. denied,* 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837 (1975). *Sanders Confectionery Products, Inc. v. Heller Financial Inc.,* 973 F.2d 474, 486 (6th Cir.1992). Since I have concluded that plaintiffs have no claim under either the 1933 or 1934 Acts, no controlling person liability can be established. I hereby grant defendants' motion for summary judgment on the §§ 15 and 20(a) claims.

### F. Margin Trading Claim

■ Throughout their Complaint, plaintiffs made only conclusory claims that defendants Oppenheimer and Altman were involved in margin and option trading which was unsuitable for the Sheldon Plans. In

Plaintiffs' Response to Oppenheimer's and Altman's Motion for Summary Judgment on the issue of margin trading, plaintiffs only discussed their margin trading claim in a cursory manner.[7] Relying on the "know your customer rule" of NYSE Rule 405, plaintiffs claim that margin trading by defendants gave rise to a federal cause of action because defendants should have known that margin trading was prohibited by the Investment Management Agreement.

In the Investment Management Agreement executed between George Cares, trustee of the Plans, and DSV, on July 15, 1985, margin trading was allowed but with certain restrictions. The Agreement provides the following:

2. The undersigned is aware that certain option transactions may be made only in a margin account but without necessarily creating a debit balance in such margin account. To enable such transactions to be made on behalf of the undersigned, the undersigned hereby authorizes the establishment of a margin account and agrees to execute Broker's Customer Agreement.

Although the undersigned has agreed to establish a margin account, the undersigned hereby instructs Broker not to effect transactions on margin in such account but agrees to permit Broker to carry a debit balance if such a debit arises because of the purchase of an option previously sold (written) or the purchase of an underlying security due to the assignment or exercise of an option previously sold (written).

It is disputed whether Oppenheimer received a copy of the Investment Management Agreement. Relying on NYSE Rule 405, plaintiffs contend that even if defendants did not receive a copy of the Agreement, the Agreement placed a duty on defendants to find out the scope of Smith's permissible conduct in the Oppenheimer account. Plaintiffs argue that defendants were required to "use due diligence to learn the essential facts

---

**7.** The following constitutes plaintiffs' discussion in whole of the margin trading claim:

Contrary to the statements made on p. 22 of Oppenheimer's brief, margin trading was unsuitable for the Plan because most uses of it

were expressly banned in the Investment Management Agreement. If Altman had a copy, then he knew that. If he didn't, he should have.

Plaintiffs' Br. at 23.

relative to every customer ... and every person holding power of attorney over any account accepted or carried out by [defendants]."

The Sixth Circuit has ruled that NYSE Rule 405 does not imply a private cause of action cognizable in federal court. *Craighead v. E.F. Hutton & Co.*, 899 F.2d 485, 493 (6th Cir.1990) (citing cases).

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). From all the available evidence, it appears that Oppenheimer and Altman simply executed buy and sell orders at the request of Smith, an investment adviser for the Sheldon Plans who had apparent authority and full discretionary power over the Sheldon accounts. In these circumstances, without any evidence to support some type of relationship creating a duty or obligation between plaintiffs and defendants, summary judgment for defendants on the margin trading claim is warranted.

Granting summary judgment for defendants Oppenheimer and Altman on the margin trading claim in no way limits plaintiff's attempt to seek from Smith/DSV, plaintiff's investment adviser, damages alleged to have been caused by Smith's unauthorized margin trading in the Oppenheimer account.

## G. Defendants' Counter–Claim

On March 10, 1993, defendants/counter-plaintiffs Oppenheimer and Altman filed a counter-claim against plaintiffs/counter-defendants the Careses, individually and as trustees of the Sheldon Plans, seeking indemnification or, alternatively, contribution from the Careses to the extent that defendants Oppenheimer and Altman are found to be liable to any or all of the plaintiffs. On March 22, 1993, plaintiffs/counter-defendants

filed a motion for judgment on the pleadings and/or to strike Oppenheimer and Altman's counter-claim and, in the alternative, motion for severance or separate trial.

Since I have granted defendants Oppenheimer and Altman summary judgment, Oppenheimer and Altman are dismissed from the case. Therefore, this motion is moot.

## II.

### *DEFENDANT BAIRD'S MOTION TO DISMISS*

Also pending is defendant Robert W. Baird & Co. Incorporated's ("Baird") Motion to Dismiss for Failure to State a Claim under Fed.R.Civ.P. Rule 12(b)(6) and 9(b).[8] The federal claims alleged against defendant Baird are also the only claims plaintiffs have alleged against defendants BMMG Capital Corp., a broker-dealer in Grand Rapids, and Timothy Moore, a registered agent at BMMG. Defendants BMMG and Moore have joined in this motion. In the discussion which follows, references to "defendant Baird" apply to all three of these defendants.

The motion is predicated upon the following grounds:

1. Plaintiffs have failed to meet the requirement of the statute of limitations applicable to claims under section 12(2) (Count XIII);

2. Defendants Baird, Moore and BMMG are not statutory "sellers" under section 12(2) and case law;

3. Plaintiffs' claim based on section 17 of the Securities Act of 1933, 15 U.S.C. § 77q (Count XIV) fails to state a claim upon which relief may be granted because there is no private right of action under section 17.

4. Plaintiffs' claims based on section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 (Count XV), as well as plaintiffs' claims of secondary liability

---

**8.** Defendant Baird, in its Motion to Dismiss, did not rely on *Congregation of the Passion, Holy Cross Province v. Kidder Peabody & Co.*, 800 F.2d 177, 181 (7th Cir.1986), discussed above with respect to defendants Oppenheimer and Altman's Motion for Summary Judgment on plaintiffs' Rule 10b–5 claim. Defendant Baird instead re-

lied on section 12(2) of the Securities Act of 1933, which I will discuss in this section. Nevertheless, the court's discussion regarding Oppenheimer and Altman's Motion for Summary Judgment on the Rule 10b–5 claim also applies to defendant Baird.

under 15 U.S.C. § 77o and 15 U.S.C. § 78t (Count XXVIII), fail to state a claim upon which relief may be granted because they are not alleged with particularity as required by Fed. R.Civ.P. 9(b).

For the reasons that follow, the motion to dismiss is GRANTED with respect to all claims against defendants Baird, Moore, and BMMG Capital Corporation.

## A. Standard for Motion to Dismiss

In a motion to dismiss for failure to state a claim under Rule 12(b)(6) and Rule 9(b), the court's inquiry is limited to whether the challenged pleadings set forth allegations sufficient to make out the elements of a right to relief. *Windsor v. The Tennessean,* 719 F.2d 155, 158 (6th Cir.1983), *cert. denied,* 469 U.S. 826, 105 S.Ct. 105, 83 L.Ed.2d 50 (1984). The factual allegations in the complaint must be accepted as true. *Jenkins v. McKeithen,* 395 U.S. 411, 421–22, 89 S.Ct. 1843, 1848–49, 23 L.Ed.2d 404 (1969). "A complaint should not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him [or her] to relief." *Craighead v. E.F. Hutton & Co.,* 899 F.2d 485, 489 (6th Cir.1990) (quoting *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). The court is also required to view the allegations in the light most favorable to the plaintiffs. *Id.* (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)).

## B. Statute of Limitations Applicable to Claims Under Section 12(2)

As I noted earlier regarding defendants Oppenheimer and Altman's motion for summary judgment (Part I, section A(1)), section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l,* imposes liability upon one who misrepresents a material fact or omits to state a material fact "by means of a prospectus or oral communication" in connection with the purchase or sale of securities. Section 12(2) is governed by the statute of limitations contained in Section 13, 15 U.S.C. § 77m.

Compliance with the statutory requirements "is an essential substantive ingredient of a private cause of action under section 11 or section 12(2)." *Bresson v. Thomson McKinnon Secur., Inc.,* 641 F.Supp. 338 (S.D.N.Y.1986). Unless sufficient facts are affirmatively pleaded to demonstrate that the requirements of section 13 have been satisfied, plaintiffs' claims must be dismissed. *Id.* *See also, In re Consumers Power Co. Secur. Litigation,* 105 F.R.D. 583, 595 (E.D.Mich. 1985).

Plaintiffs allege that between 1986 and 1989 Smith directed BMMG/Baird to issue a number of checks written on the Sheldon Plans' account and signed in each case by two BMMG/Baird employees. For example, Smith wrote Moore, a registered agent at BMMG, on July 17, 1986, directing BMMG to "issue a check for $25,000 to Call Free, Inc., 6140 28th Street, S.E., Grand Rapids, Michigan 49506 in purchase of 1,000 Shares Common Stock from the account of Sheldon Company Retirement Plan A/C No. 12777[0]17." In August 1987, Smith wrote to the firm ordering a check for $10,000 payable to Executive Capital Co. for a "2% Oil Well Interest." Allegedly, Smith embezzled most of the money from his clients' accounts at BMMG in this manner.

Smith's fraudulent concealment was discovered in late May, 1991, and the complaint was filed on March 11, 1992, within one year of discovery. I find that only the June 1989 claim involving a transfer by Baird to "Executive Capital Co." in the amount of $50,000.00 survives because it was the only transaction that occurred within three years of the filing of plaintiffs' complaint. As a result, transactions of the checks written on plaintiffs' account prior to the June 13, 1989, "Executive Capital Co." check are barred by the three-year statute of limitations period prescribed by section 13. The three-year period is an absolute outer limit. *Bresson v. Thomson McKinnon Secur., Inc., supra.* Plaintiffs' action was brought too late to enforce a liability regarding the other seven transactions.

Although I am satisfied plaintiffs' June 1989 claim involving $50,000 survives the statute of limitations under section 12(2), I

am convinced as a matter of law that defendant Baird is not a statutory "seller" under section 12(2).

## C. Defendant Baird Is Not a Seller

■ Section 12(2) provides a cause of action only against one who has offered or sold securities. Defendant Baird seeks dismissal on the basis that no "sale" occurred between plaintiffs and defendant. Section 2(3) of the 1933 Act defines "sale" or "sell" to include "every contract of sale or disposition of a security or interest in a security, for value." Section 2(3) also defines the terms "offer to sell," "offer for sale," or "offer" to include "every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value." 15 U.S.C. § 77b(3).

With respect to the June 13, 1989, check in the amount of $50,000, was defendant Baird a statutory seller under section 12(2) of the Securities Act of 1933?

The landmark case on the elements required to make one a statutory seller of securities is *Pinter v. Dahl*, 486 U.S. 622, 644–45, 108 S.Ct. 2063, 2077–78, 100 L.Ed.2d 658 (1988). In *Pinter*, the Supreme Court formulated a test to determine who would be considered a "seller" under section 12(1): "The language and purpose of § 12(1) suggests that liability extends only to the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Id.* at 647, 108 S.Ct. at 2078. Although the definition of "seller" set forth in *Pinter* was in context of section 12(1) of the Securities Act, every appellate court that has considered the question has determined that *Pinter* applies equally to section 12(2) of the Act, which prohibits offering or selling security by means of a prospectus or oral communication containing an untrue statement of material fact. *See Mercer v. Jaffe, Snider, Raitt and Heuer, P.C.*, 713 F.Supp. 1019, 1024 (W.D.Mich.1989), *aff'd without op.*, 933 F.2d 1008 (6th Cir.1991).

In *Smith v. American National Bank and Trust Co.*, 982 F.2d 936 (6th Cir.1992), plaintiff invested in an automobile dealership. Plaintiff agreed to guarantee $600,000 to cover overdrafts for the dealership in exchange for an option to purchase fifty-one percent of the stock of the dealership and a half interest in certain real estate. The agreement between plaintiff and the dealership owner was reached without any participation or solicitation by defendant bank. When plaintiff met with defendant bank to discuss the note, defendant bank never disclosed the problems, such as that the dealership's "overdraft" had been caused by a kiting scheme, even though defendant bank was aware of financial problems at the dealership. After the dealership's overdrafts were paid with the loan proceeds, the dealership went bankrupt. Plaintiff sued the bank for alleged failure to disclose the dealership's financial condition. The district court dismissed plaintiff's claim against the bank under section 12(2), concluding that plaintiff failed to state a claim because it failed to allege that the defendant bank solicited plaintiff's purchase.

■ On appeal, the Sixth Circuit affirmed, stating that "[t]he fact that one is not an actual owner of securities does not necessarily prevent him from being a statutory seller. A non-owner cannot be a seller, however, unless he urges a prospective purchaser to buy." *Smith*, 982 F.2d at 941 (citing *Pinter v. Dahl*, 486 U.S. 622, 644–45, 108 S.Ct. 2063, 2077–78, 100 L.Ed.2d 658 (1988)). Based on *Pinter* and the recent *Smith* case in this Circuit, the current test is "whether the defendant either passed title or offered to do so, or solicited an offer." *Smith*, 982 F.2d at 942.

Applying this test to the section 12(2) claim asserted in plaintiffs' amended complaint, I conclude that plaintiffs have failed to establish actual ownership or solicitation on the part of defendant. The record is clear that Smith alone chose the purchase date, and ordered the June 13, 1989, check.

Furthermore, the balance sheet of DSV concerning the Sheldon Plans clearly shows that the transaction of Executive Capital Co. in the amount of $50,000 was a non-brokered investment for which Baird received no commission and that the transactions were purely the result of the request by Smith. The company record makes a distinction between

the brokered and non-brokered investments. It is clear that the $50,000 in controversy was not a sale between defendant Baird and Smith.

Having determined that no sale existed, the question remains whether defendants in fact solicited an offer from plaintiffs to buy the stock. In *Pinter*, the Court concluded that "when a broker acting as agent of one of the principals to the transaction successfully solicits a purchase, he is a person from whom the buyer purchases within the meaning of § 12 and is therefore liable as a statutory seller." *Pinter*, 486 U.S. at 646, 108 S.Ct. at 2078.

There are no allegations nor proof that Baird solicited the sale or in any way participated as a broker in the transaction. "Brokers have been held liable as 'sellers' only in those cases where they were closely aligned with the title-holding parties or worked as agents of the securities issuers." *Craighead, supra,* 899 F.2d at 493 (6th Cir.1990) (citing *Adalman v. Baker, Watts & Co.,* 807 F.2d 359, 364–65 (4th Cir.1986); *Leonard v. Shearson Lehman/American Express Inc.,* 687 F.Supp. 177, 179–80 (E.D.Pa.1988); *Beck v. Cantor, Fitzgerald & Co.,* 621 F.Supp. 1547, 1560–62 (N.D.Ill.1985)). It is undisputed that contacts were initiated by Smith. The letters from Smith to Baird requesting withdrawal of funds from the Baird account demonstrate that Smith as plaintiffs' investment advisor made routine requests to Baird to disburse funds which Smith used in making "other investments."

In sum, plaintiffs not only have not alleged that defendant Baird, acting as agent of the principal to the transaction, solicited Smith to buy certain stocks, *See Ryder Int'l Corp. v. First American Nat'l Bank,* 749 F.Supp. 1569, 1575 (N.D.Ala.1990), *aff'd,* 943 F.2d 1521 (11th Cir.1991), but even if they had, there is no evidence to support such allegation. Consequently, even if plaintiffs were allowed to amend, it is clear that plaintiffs cannot prove sufficient facts to support a contrary conclusion or raise a factual issue concerning defendant's section 12(2) liability. The court will, therefore, grant defendant's motion to dismiss Count XIII.

## D. Private Cause of Action Under Section 17

Plaintiffs charge defendant Baird in Count XIV with offering or selling securities to the Sheldon Plans by the use of one or more means or instruments of transportation or communication in interstate commerce. Defendant Baird argues that Count XIV of the complaint must be dismissed because there is no implied right of action under section 17(a) of the 1933 Act, 15 U.S.C. § 77q(a).

I have analyzed section 17(a) of the 1933 Act in my discussion above with regard to Oppenheimer and Altman's Motion for Summary Judgment (Part I, section D), and will not repeat it here. As stated above, although I am satisfied that, in this Circuit at the present time at least, a private cause of action for "purchasers" exists under section 17(a), since I have concluded defendant Baird is not a "seller" under the statute, Count XIV on section 17(a) shall be dismissed.

## E. Particularity Requirement of Section 10(b) and Rule 10b–5 as Required by Fed.R.Civ.P. 9(b)

An essential element of plaintiffs' section 10(b) and Rule 10b–5 claim is that defendant's misrepresentations or omissions were made in connection with the purchase or sale of any security. *See Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 733, 95 S.Ct. 1917, 1924, 44 L.Ed.2d 539 (1975). Although the court has serious doubts whether misrepresentations and omissions have been adequately pled under Fed.R.Civ.P. 9(b), the issue is moot in light of the fact the court has ruled that defendant, not being a seller, is as a matter of law not liable under the federal securities act.

## F. Secondary Liability under 15 U.S.C. § 77o and § 78t

In Count XXVIII, plaintiffs argue that defendant Baird is secondarily liable under § 15 of the 1933 Act, 15 U.S.C. § 77o, and § 20(a) of the 1934 Act, 15 U.S.C. § 78t(a). Sections 15 and 20(a) permit liability to be derivatively imposed on those who directly or indirectly control primary violators of the securities laws.

Based on my earlier analysis of secondary liability regarding defendants Oppenheimer and Altman's motion for summary judgment, I likewise conclude with regard to Baird/BMMG that since no primary liability exists under the 1933 or 1934 acts, no controlling person liability can be established. Count XXVIII is hereby dismissed.

## G. Plaintiffs' State Law Claims Against Baird

■ The court may exercise pendent jurisdiction where the "state and federal claims ... derive from a common nucleus of operative fact ... such that [plaintiff] would ordinarily be expected to try them all in one judicial proceeding." *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). Furthermore,

> Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

*Id.* at 726, 86 S.Ct. at 1139.

Jurisdiction in the state law counts is based upon the existence of a federal question. The court has jurisdiction over the common law claims only as they are pendent to the federal causes of action. Accordingly, the court will exercise its discretion in ordering the pendent state claims dismissed without prejudice for lack of a substantial federal claim.

### III

## PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

On March 9, 1993, plaintiffs filed a Motion for Partial Summary Judgment Against Dolinka, Smith & VanNoord ("DSV") pursuant to Fed.R.Civ.P. 56. Rule 56 requires the moving party to show that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Therefore, the court must look at the record in this case in the light most favorable to the nonmoving party. For the reasons that follow, plaintiffs' Motion for Partial Summary Judgment against DSV is GRANTED.

## A. Employee Retirement Income Security Act ("ERISA")

■ Plaintiffs claim that DSV violated its fiduciary duties in violation of 29 U.S.C. § 1104. The section provides:

> (a) Prudent man standard of care (1) ... a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
> (A) for the exclusive purpose of:
>
> > (i) providing benefits to participants and their beneficiaries; and
> >
> > (ii) defraying reasonable expenses of administering the plan;
>
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
>
> (C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and
>
> (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter.....

Defendant DSV does not dispute that its ex-partner Smith breached his fiduciary duty with respect to the Sheldon Plans. However, defendant argues that the breach by Smith should not impute liability to the other partners of DSV who also acted as fiduciaries under the plan because plaintiffs have not produced any evidence that other partners of DSV either participated in, knew about or undertook to conceal Smith's crimes. Defendant relies on 29 U.S.C. § 1105(a).

However, this section, "Liability for breach of co-fiduciary," addresses the issue of when one fiduciary is liable for a breach of another fiduciary's responsibility with respect to the same plan. Defendant DSV's reliance on

this section of ERISA is therefore misplaced. The case at bar deals with one entity only, i.e., defendant DSV. Both Smith, an ex-partner of DSV, and DSV itself are considered to be one entity under the Uniform Partnership Act, M.C.L.A. § 449.1, et seq. (West 1989). This is clearly shown by the acknowledgement contained in the Investment Management Agreement of July 15, 1985, executed for DSV by Smith:

> Dolinka, Smith & VanNoord hereby acknowledges by execution and acceptance of this agreement, that acting as an Investment Manager (as defined in Section 1(38) of the Employee Retirement Income Security Act of 1974, as amended) to the Plan, DSV shall be deemed to be a "fiduciary" to the Plan to the extent of the assets of the Plan deposited with _____ and subject to the management of DSV. As a "fiduciary" to the Plan, DSV shall be subject to the duties and liabilities imposed by said Act upon parties of such status.

> Dolinka, Smith & VanNoord hereby accepts the position as an Investment Manager to the Plan.

(Plaintiffs' Ex. 2).

It is evident that plaintiff George Cares, on behalf of the three trustees of the two Sheldon Plans, signed the Investment Management Agreement with DSV, not with the individual partners of DSV. Plaintiffs' motion for partial summary judgment is directed against defendant DSV, not against the individual partners of DSV. Therefore, the issue presented by the motion is not whether the wrongful acts of Smith, one of the Plans' fiduciaries, should impute liability to the other partners of the firm, but whether DSV should be held primarily liable as a fiduciary of the Plans.

It is well-established that partnerships are liable for the wrongful acts of partners. Sections 449.13 and 449.14 of the Michigan Uniform Partnership Act provide:

> Sec. 13. (PARTNERSHIP BOUND BY PARTNER'S WRONGFUL ACT).

> Where, by any wrongful act or omission of any partner acting in the ordinary course of the business or the partnership, or with the authority of his copartners, loss or injury is caused to any person, not being a partner in the partnership, or any penalty is incurred, the partnership is liable therefor to the same extent as the partner so acting or omitting to act.

> Sec. 14. (PARTNERSHIP BOUND BY PARTNER'S BREACH OF TRUST). The partnership is bound to make good the loss:

> (a) Where 1 partner acting within the scope of his apparent authority receives money or property of a third person and misapplies it; and

> (b) Where the partnership in the course of its business receives money or property of a third person and the money or property so received is misapplied by any partner while it is in the custody of the partnership.

Partnership liability in Michigan is founded on agency principles. M.C.L.A. § 449.4(3); 449.9(1). A principal is liable to a third person if the principal's agent was acting within the scope of his actual or apparent authority. Restatement (Second) of Agency § 140. Partners are jointly and severally liable for everything chargeable to the partnership as a result of another partner's misdeeds in the ordinary course of business of partnership. M.C.L.A. § 449.15. See Silverman v. Niswonger, 761 F.Supp. 464, 469 (E.D.Mich.1991).

In Vidosh v. Holsapple, 1987 U.S.Dist. LEXIS 15749 (E.D.Mich. Feb. 2, 1987), the Eastern District of Michigan cited an Oregon Supreme Court case in its decision that partners are jointly and severally liable under the provisions of the Michigan Uniform Partnership Act and the Oregon Uniform Partnership Act. The Michigan and Oregon Partnership Acts are identical.[9] In Croisant v. Watrud, 248 Or. 234, 432 P.2d 799 (1967), the Oregon Supreme Court held that unautho-

---

**9.** See Oregon Rev.Stat. 68.010–68.650.

The court stated that since the Act is "interpreted and construed as to effect its general purpose to make uniform the law of those states which enact it," M.C.L.A. § 449.4(4), it is "appropriate to look to Oregon law to determine partnership law questions unanswered by Michigan courts." Vidosh, 1987 U.S.Dist. LEXIS 15749, at *46 n. 14.

rized payments to the client's husband and the unauthorized drawing of a check payable to defendant himself were not separate and distinct activities from the activities in which the partnership itself was engaged. The court held:

> If a third person reasonably believes that the services he has requested of a member of an accounting partnership is undertaken as a part of the partnership business, the partnership should be bound for a breach of trust incident to that employment even though those engaged in the practice of accountancy would regard as unusual the performance of such service by an accounting firm.

*Id.* 432 P.2d at 803.

In the instant case, defendant DSV does not dispute, nor could it, that Smith failed to discharge his duties with respect to the interests of the Plans, participants and beneficiaries. Furthermore, in conducting his activities that breached his fiduciary duty while he was a partner of DSV, Smith wrote letters to clients and third parties on firm stationery. Smith's investment advisory business had to be conducted at least in part during DSV's hours because that was when the stock markets were open. Unquestionably, Smith acted with apparent authority when he dealt with plaintiffs as an investment adviser.

I am satisfied as a matter of law that Smith's embezzlements occurred while he was acting in the ordinary course of the partnership business. His embezzlements

from the two Sheldon Plans were a breach of his fiduciary duty. As Smith was simply an agent of DSV, DSV as the principal and as an investment adviser to the Plans, is a fiduciary under ERISA and is liable for the breach as well. 29 U.S.C. § 1109.[10]

Since the issue of damages is not before the court, I grant summary judgment on the issue of liability only.

## B. Investment Advisers Act of 1940

### 1. Section 203.

 Plaintiffs argue that they are entitled to partial summary judgment on liability against DSV because the investment agreement between plaintiffs and DSV was void as a result of DSV's failure to continue its registration as an investment adviser with the Securities and Exchange Commission.

DSV was registered as an investment adviser under the Investment Advisers Act of 1940, 15 U.S.C. §§ 80b–1, *et seq.* DSV's registration was granted by an order of the SEC dated March 2, 1984.[11] Thereafter, the SEC sent two letters to DSV dated December 12, 1985, and October 8, 1986, warning that, unless the registration was amended by filing a new Form ADV by March 31, 1986, the SEC would cancel the registration. The new Form ADV was not filed by the due date, and the SEC subsequently cancelled DSV's registration in November 1987. DSV continued to act as an investment adviser until at least May 1991. DSV did not know

---

10. Section 1109 provides:

 (a) Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary. A fiduciary may also be removed for a violation of section 1111 of this title.

 (b) No fiduciary shall be liable with respect to a breach of fiduciary duty under this subchapter if such breach was committed before he became a fiduciary or after he ceased to be a fiduciary.

11. The Order Granting Registration Pursuant to Section 203 of the Investment Advisers Act of 1940 reads as follows:

 Dolinka, Smith and VanNoord, hereinafter referred to as the Applicant, having made application with the Commission for registration as an investment adviser pursuant to Section 203 of the Investment Advisers Act of 1940 on January 18, 1984; and

 The Commission having found that the Applicant has satisfied the requirements of such Section:

 It IS ORDERED, that the Applicant's registration be and hereby is granted, this 2nd day of March 1984.

 FOR THE COMMISSION, by the Office of Application and Reports Services pursuant to delegated authority.

 (Signed)

that its SEC registration had been cancelled until its attorney checked with the SEC in early March 1992.

As stated above, plaintiffs entered into the Investment Management Agreement with DSV on July 15, 1985. After November 1987, when the SEC cancelled DSV's registration as an investment adviser, DSV was no longer in compliance with the registration provisions of the Act. Section 203, 15 U.S.C. § 80b–3, makes it unlawful for a person to make use of mails or interstate commerce in connection with business as an investment adviser unless the person is registered under the Act. Since at the time DSV made use of mails or interstate commerce in connection with its business as an investment adviser, and DSV was unregistered as an investment adviser, defendant DSV clearly has violated the statute. Section 203 is a strict liability provision. *SEC v. Blavin*, 557 F.Supp. 1304 (E.D.Mich.1983), *aff'd*, 760 F.2d 706 (6th Cir. 1985) (quoting *SEC v. Myers*, 285 F.Supp. 743 (D.Md.1968)). Thus, the court grants summary judgment on the issue of liability under § 203 for plaintiffs.

**2. Section 206.**

The embezzlement of monies from the Plans further violated § 206, as set forth in 15 U.S.C. § 80b–6, which prohibits certain transactions. Section 206 states in pertinent part:

§ 80b–6. Prohibited transactions by investment advisers

It shall be unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud any client or prospective client;

(2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client.

The record is clear that defendant DSV as the investment adviser violated sections 206(1) and 206(2) of the IAA. The provisions in section 206(1) are analogous to section 10(b), 15 U.S.C. § 78j(b), of the Secu-

rities Exchange Act of 1934. Section 10(b) specifically proscribes fraudulent practices by investment advisers and proof of its violation requires proof of scienter. *SEC v. Blavin*, 557 F.Supp. 1304, 1315 (E.D.Mich.1983), *aff'd*, 760 F.2d 706 (6th Cir.1985) (quoting *Steadman v. SEC*, 603 F.2d 1126 (5th Cir. 1979), *aff'd*, 450 U.S. 91, 101 S.Ct. 999, 67 L.Ed.2d 69 (1981)). *See also Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976). The court is satisfied that there are no issues of material fact with respect to defendant DSV's material misrepresentations or omissions. Smith embezzled money from his clients. He pled guilty to the charge. The court is satisfied that the misrepresentations or omissions were made knowingly and intentionally, and with scienter. DSV also violated § 206(2) of the IAA because it engaged in conduct which operated as a fraud on his clients or prospective clients. A violation of section 206(2) can be supported without a showing of scienter, and without actual injury to any client. *SEC v. Blavin*, 760 F.2d 706, 711 (6th Cir.1985) (citing *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 195, 84 S.Ct. 275, 284–85, 11 L.Ed.2d 237 (1963)).

Based on the above discussion, it is clear that plaintiffs are entitled to summary judgment under the Investment Advisers Act.

**CONCLUSION**

Therefore, in conclusion:

1. The Motion for Summary Judgment filed by defendants Oppenheimer and Altman is granted, and they are dismissed from this action.

2. The Motion to Dismiss filed by defendant Baird, joined by defendants Moore and BMMG, is granted, and defendants Baird, Moore and BMMG are dismissed from this action.

3. Plaintiffs' Motion for Partial Summary Judgment as to liability against defendant Dolinka, Smith & VanNoord is granted.

4. Plaintiffs' Motion for Judgment on the Pleadings and/or to Strike Oppenheimer & Co., Inc.'s and Sheldon Altman's Counter-

Parquet

Claim and, in the Alternative, for Severance or Separate Trial is dismissed as moot.